Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WAYNE R. ANDERSEN | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 99 C 3571 | DATE | MARCH 9, 2000 |
| CASE TITLE | Moss v. Mormon | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order granting in part and denying in part defendants' motion to dismiss [45-1]. Defendants Wilson, Sarrazin, Hollenbeck and Reed are dismissed.

(11) ■ [For further detail see order attached to the original minute order.

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAR 10 2000 date docketed | |
| X | Docketing to mail notices. | | | 62 |
| | Mail AO 450 form. | | IS docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

CARL MOSS,

    Plaintiff,

v.

JASON MORMON, et al.

    Defendants.

No. 99 C 3571

Judge Wayne R. Andersen

DOCKETED
MAR 1 0 2000

## MEMORANDUM OPINION AND ORDER

Plaintiff Carl Moss, an inmate in the custody of the Illinois Department of Corrections (IDOC) and currently incarcerated at Menard Correctional Center, brought this pro se complaint under 42 U.S.C. § 1983 against officers and officials at Joliet Correctional Center where he was previously housed, alleging violations of his constitutional rights. Exercising its power under 28 U.S.C. § 1915A to review prisoners' complaints prior to service, by order dated September 2, 1999, this court dismissed certain defendants because the complaint did not allege their personal involvement in the alleged constitutional violations. Moss appealed this court's order to the Court of Appeals, which dismissed the appeal on January 28, 2000 for lack of jurisdiction. The remaining defendants have not answered, but moved to dismiss the complaint under Rule 12(b)(6), Fed.R.Civ.P.

A motion to dismiss raises purely legal issues. The court must assume that the allegations in the complaint are true, and draws every reasonable inference in the plaintiff's favor. *LeBlang Motors, Inc. v. Subaru of America, Inc.*, 148 F.3d 680, 690 (7th Cir. 1998). A pro se complaint is held to less stringent standards than a complaint drafted by an attorney. *Swofford v. Mandrell*, 969 F.2d 547, 549 (7th Cir. 1992). A plaintiff may assert additional facts in response to the motion, as long as they are consistent with the complaint. *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1428 (7th Cir.1996).

62

Further, where the plaintiff is proceeding pro se, the court must consider allegations contained in all documents filed with the court. *Hughes v. Rowe*, 449 U.S. 5, 10 n.8 (1980); *Swofford*, 969 F.2d at 549. In this case, this includes exhibits filed in this court, apparently intended to be in support of his appeal, that may not have been served on the defendants.

This case arises from an assault on Moss by another inmate on May 6, 1998, breaking Moss's jaw. The jaw did not heal properly and he was left with a permanently misaligned jaw making it very difficult to chew. Moss's two claims -- that certain defendants failed to protect him and that certain others denied him proper medical care -- are completely distinct, and will be addressed separately.

## A. FAILURE TO PROTECT

### 1. Allegations

According to Moss, the real cause of his assault was his attempt to prove that defendant Dave Sarrazin is a thief. Moss alleges that Sarrazin, the Personal Property Officer at Joliet, regularly stole inmates' possessions. Sarrazin's inmate clerk, according to Moss, was known to be a leader of the Latin Kings, and Moss suspected that Sarrazin was in cahoots with the Latin Kings. Moss wrote to IDOC Deputy Director Watkins, who sent investigators from IDOC's internal affairs department to Joliet. At a meeting with Moss on July 15, 1997, defendant investigator Hollenbeck agreed that Sarrazin was a problem, and asked Moss to "get more hard evidence." Moss told him that exposing Sarrazin's gang ties could put his life in danger. This meeting was held in the office of defendant Lieutenant Reed, who, unknown to Hollenbeck, was a close personal friend of Sarrazin. Moss believes Reed listened in and reported his allegations back to Sarrazin.

Nine months later, in the last week of April of 1998, Moss obtained "hard evidence," allegedly papers proving that Sarrazin had stolen Moss's watch. Moss states that several days

2

later Sarrazin was caught by another correctional officer giving a bag containing expensive (and forbidden) gym shoes to "his gang chief ex-clerk." On May 5, 1998, Moss wrote a letter to Carter explaining the proof he had, marked it "privileged mail," and left it in the bars of his cell for pickup.

The next evening, Moss was assaulted by a member of the Latin Kings in the shower. Before the assault, Moss saw two inmates, Martin and Cuevas, whom he had seen in the company of the Latin Kings leader. Martin, was wearing shoes and shorts, which Moss thought odd. Moss saw Cuevas make a gesture pointing his right index into his left palm, as if indicating someone should go in that direction. Moss resumed washing his face, and when his eyes were closed Martin punched him from behind. When he regained consciousness, he was on the floor in the changing area, 25 or 30 feet from the shower area, and Martin was beating Moss's head into the floor with his fists. After several minutes, defendant Lieutenant Nance grabbed Martin and broke his grip on Moss, and Moss got up and crossed the room to get away from Martin. But Nance did not restrain Martin, who came across the room and kicked Moss in the face, breaking his jaw.

Defendant Jason Mormon had been the correctional officer who was supposed to observe the inmates in the shower. In a disciplinary report in which he accused Moss of "fighting" with Martin, he admitted that he left his post, and Moss alleges that he did so just prior to the assault. In hindsight, Moss infers that Cuevas's gesture was directed at Mormon, telling him to leave. He points out the obvious, that Mormon was assigned to watch the shower precisely to prevent inmate-on-inmate assaults.

Moss's disciplinary ticket was dismissed after it was determined that Moss was not fighting, and his grievance against Nance was dismissed as moot.

3

## 2. Exhaustion of Administrative Remedies

Defendants assert that this claim cannot proceed against Hollenbeck, Wilson or Reed because Moss has not exhausted administrative remedies as required by 42 U.S.C. § 1997e(a), which provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Defendants have attached to their motion an affidavit by Mary E. Nichols, Coordinator of Inmate Issues for IDOC, stating that a search of the records of the Prisoner Review Board, which represents the final step in the grievance procedure, shows no grievances against these defendants relating to Hollenbeck and Reed. (Wilson is named only in connection with another claim.)

Defendants cite the recent case of *Perez v. Wisconsin Department of Corrections*, 182 F.3d 532 (7th Cir. 1999), but fail to notice that *Perez* acknowledges an exception to the exhaustion requirement:

> It is possible to imagine cases in which the harm is done and no further administrative action could supply any "remedy." .... Suppose the prisoner breaks his leg and claims delay in setting the bone is cruel and unusual punishment. If the injury has healed by the time suit begins, nothing other than damages could be a "remedy," and if the administrative process cannot provide compensation then there is no administrative remedy to exhaust.

*Id.* at 538. That would appear to be the case here. Once the assault has happened, it had happened, and if the officers were responsible, the grievance procedure offered no remedy. Moss's medical claims are another matter, since there may have been the possibility that while treatment was ongoing, grievances might have led to an improvement in Moss's care. We will examine that question below.

## 2. Defendant Wilson

Nevertheless, the court will grant the motion to dismiss defendant Wilson for a different reason. Wilson, as the grievance officer, is not alleged to have participated in either alleged deprivation of Moss's constitutional rights. Scattered through the documents are many complaints that Wilson mishandled grievances, lost them, routinely denied them, and fouled up the grievance appeal process. But while some of these allegations might conceivably be relevant to the exhaustion issue, there is no constitutional right to an effective grievance procedure, or any grievance procedure at all. Moss argues eloquently for the benefits of a fair, impartial and effective grievance procedure. But federal courts do not run prisons, or force prison administrators to adopt enlightened management practices. Inmates have the right not to have their constitutional rights violated, and to sue in court for violations. But they do not have a right to an administrative remedy, and if one exists, the state's creating this procedural right does not create a liberty interest that may be protected under the Due Process Clause. *Antonelli v. Sheahan*, 81 F.3d 1422, 1430-31 (7th Cir. 1996).

The court in *Antonelli* noted in passing that prisoners do have a constitutional right to petition for a redress of grievances. But the exhibits show that Moss was not prevented from writing to prison officials, and, of course, bringing this suit. *See Antonelli*, 81 F.3d at 1430.[1] As it appears that Moss cannot state a claim against Wilson, she is dismissed as a defendant.

## 3. Defendant Nance

Defendant Nance contends that Moss has not stated a claim against him. Moss has alleged no more than that Nance failed to restrain Martin after separating him from Moss.

---

[1] *Antonelli* was decided prior to the PLRA and its requirement that inmates exhaust administrative remedies. Now that exhaustion is a prerequisite to suit, a prisoner could claim that interference with the grievance procedure amounted to interference with his access to the courts. That is not an issue here, however, in view of this court's position below that interference permits the court to waive the exhaustion requirement.

5

Moss asserts that this was in violation of ordinary procedures, that, he believes, required Nance to restrain Martin. But Nance is correct that neither failure to follow standard procedures nor gross negligence can support an Eighth Amendment claim. "[P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 831-33 (1994). But while failing to protect a prisoner can amount to cruel and unusual punishment, punishment implies a culpable mental state which requires conscious knowledge that the prisoner is at risk. "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. Nance can be liable only if his deliberate indifference effectively condoned the attack by allowing it to happen. *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997).

Moss asserts that Nance "knew or should have known that Martin would continue his assault on [Moss] if left unrestrained." Complaint at 8. Nance is not liable if he merely "should have known." But "known or should have known" includes "known." The question becomes whether Moss has alleged facts from which it can be inferred that Nance actually knew of the risk to Moss.

Nance points out that immediately before the assault, he had separated Martin from Moss, showing that he was trying to prevent harm to Moss, so his failure to restrain Martin could not be more than negligence. Nevertheless, taking Moss's allegations as true, the danger was so glaringly obvious that the inference of actual knowledge can be drawn. "A factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996).

Joliet is a maximum security prison where violence can be expected. Nance did not come upon a friendly wrestling match; Martin was beating Moss's head against the floor. Martin clearly intended to cause Moss great bodily harm, if not kill him. Martin was twenty-one and in good shape, while Moss was sixty and overweight, Plf. Rsp. at 13, so there could have been little doubt who was the aggressor. Nance had to pull Martin off of Moss; it can be inferred that because Martin did not stop his assault when Nance arrived, Nance's presence would not deter him from assaulting Moss again, and he needed to be restrained. It is hard to imagine a more obvious danger.

Once the danger was known, Nance's failure to act could subject him to liability, even if he did not actually wish to see Moss hurt. "[A] prisoner claiming deliberate indifference need not prove that the prison officials intended, hoped for, or desired the harm that transpired. The standard for deliberate indifference 'is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Haley*, 86 F.3d at 641 (quoting *Farmer*, 511 U.S. at 835). Of course, it well may be that Nance had no time to restrain Martin, or was unable to do so, but that is a question of fact that may not be decided on a motion to dismiss.

### 4. Defendant Mormon

Mormon argues similarly that he was no more than negligent in leaving his post at the shower and cannot be liable. He asserts that Moss's "conjecture" that Mormon left in response to Cuevas's hand gesture is not a "well pleaded fact." Moss asserts that Cuevas made the gesture, and immediately thereafter Moss found himself under attack and Mormon gone. As stated above, the court is required to draw all reasonable inferences in the Moss's favor. Since the allegations do not suggest either a different meaning for Cuevas's gesture or an alternative reason for Mormon's departure, we must draw the inference Moss suggests.

7

Further, Moss states in his response that when Mormon returned he "made no attempt to separate Plaintiff from Martin and in fact, waited for Lt. Nance to arrive and take the responsibility of stopping the assault." Plf. Rsp. at 13-14. Depending on the circumstances, this could be independent grounds for liability.

### 5. Other Defendants

There does not appear to be any basis for holding Hollenbeck liable for the assault. Assuming that he knew that Moss's cooperation with the investigation might endanger him, the court cannot infer from the complaint that it was Hollenbeck's responsibility to take precautions to protect Moss, and Moss does not state what he could have done but did not do. And while Moss may have put Hollenbeck on notice that he was threatened by the Latin Kings, Hollenbeck had no reason to know that a correctional officer would conspire with them to withdraw his protection of Moss at the moment of the assault on him. Hollenbeck is accordingly dismissed as a defendant.

Sarrazin is a more difficult case. It can be inferred from the complaint that Sarrazin had a grudge against Moss, that he had connections with the Latin Kings, and that members of the Latin Kings participated in the assault on Moss. But these inferences do not amount to an allegation that Sarrazin was directly involved in the assault. It is equally possible that leaders of the Latin Kings resented Moss's protests against their influence and ordered the "hit" without Sarrazin's participation. Moss does not actually allege that Sarrazin directed the assault, and it does not appear that he has any evidence for this. Accordingly, Sarrazin is dismissed as a defendant. For the same reason Reed must also be dismissed, because it is no more than conjecture that Reed overheard Moss's conversation with Hollenbeck and reported it to Sarrazin or the Latin Kings.

## B. DENIAL OF MEDICAL CARE

### 1. Allegations

After he was kicked by Martin, Moss was taken to the prison hospital. The next day he was X-rayed, confirming that his jaw was broken. He was kept in an observation cell for a week and given non-prescription pain relievers. He was then taken to a hospital in Joliet called "Amsurg." Defendant Craig, a dentist, installed metal brackets to his upper and lower jaws. Each bracket was secured by stainless steel wires to Moss's teeth, and rubber bands were used to lock the brackets together, immobilizing his jaw.

When Moss awoke from the anesthesia, he discovered that Craig had carelessly wired his tongue to the bottom of his mouth so that he could not spit or speak. Back at the prison, Moss was able to work his tongue free, but several of the rubber bands holding the brackets together had broken. The hooks where the rubber bands were fastened had sharp edges that cut through the rubber. Moss contacted the dentist at Joliet, Dr. Mitchell, and explained that he needed more rubber bands. She told him that Craig had sent the rubber bands to Stateville by mistake, that only Craig could replace the bands, and that "he usually visited [Joliet] every other week or so." Cmplt. at 12. He begged Mitchell to go by Stateville and pick up the bands on her way to work, but she refused. Thereafter he begged Mitchell "almost daily" for the rubber bands. Moss knew, and alleges both Craig and Mitchell "knew or should have known," that unless his jaw was immobilized in the first few days following being set, it would not heal properly. He alleges that the Joliet dental staff "just didn't care what happened."[2]

When Craig saw him again, he saw that the inside of Moss's mouth had been cut by sharp protrusions on the brackets that had also cut the rubber bands. He gave Moss some dental wax to stop the cutting, but still did not provide the rubber bands. Craig told him that the bands had been sent to Stateville by mistake, but refused Moss's offer to pay the postage to

---

[2] Surprisingly, Moss did not name Mitchell as a defendant.

9

have the bands sent to Joliet. Moss believes that Craig was aware of his constant requests to Anderson for the rubber bands. Craig never provided them.

Moss alleges that he repeatedly asked the Joliet dental staff for rubber bands, but never received them, although they occasionally gave him more wax. Finally, on June 11, a month after Moss's jaw had been set, a Dr. Ward provided him with rubber bands. But by then it was too late. Although he complained that his jaw was misaligned, no new x-rays were taken. Finally on June 30, 1998, he was x-rayed again, and the next day Craig told him that his jaw had not healed yet. Moss begged for more rubber bands, explaining that sharp edges on the brackets were cutting the bands. Craig denied that they were sharp, but when he ran his finger over them, his glove was torn and it appeared that his finger had been cut.

Moss begged Craig to do something about the pain caused by the sharp edges, and Craig tried tightening the wires holding the bracket to Moss's teeth. He "used [Moss's] lip as a fulcrum" to brace against while twisting the wires, causing Moss severe pain. When Moss protested that Craig was hurting him, "[Craig] became upset and started throwing (dropping) his tools into the sink." Cmplt. at 15.

When Craig again saw him two weeks later, Moss asked him for more rubber bands and wax, but Craig refused. Since the brackets were useless without the rubber bands, Moss asked Craig to remove them, which Craig also refused to do. At this point Moss requested copies of his medical records, which he also did not receive. When Moss was discharged from the hospital he requested, and received, protective custody.

After Moss wrote to the Will County State's Attorney at the end of July of 1998 asking that his assailant be prosecuted, he was transferred to Menard Correctional Center, allegedly in retaliation for this. At Menard Moss again requested medical attention for his jaw. The Menard dentist, Dr. Grubman, told him that he would have to be seen by Craig before he could do anything. On August 20, Moss was x-rayed by Menard medical staff. Craig did not see

him, but sent word through a nurse that the jaw had not healed yet and that Craig might see him in another month. Moss asked the nurse to ask Craig to remove the top bracket, since it was not immobilizing his jaw and was causing him pain. Craig refused. The brackets were finally removed by Dr. Grubman in the fall of 1998. Moss states that the alignment of his teeth is "way off," and chewing is impossible.

### 2. Exhaustion Of Administrative Remedies

Moss admits in the complaint that "there has been no grievance written about the shoddy dental work performed by Dr. Craig," Cmplt. at 3, and defendants have moved to dismiss on this ground. Moss responds that he did submit grievances. The first was returned by counselor Juan Tellez, "stating that he could not adjudicate a medical claim." Plf. Resp. at 7. This may have been correct, in that grievance review personnel would not be expected to override medical judgments. Additionally, it appears that Dr. Craig was not an IDOC employee but an independent contractor, and not subject to control by IDOC. In that event, the grievance procedure would not have been an "available remedy."

Further, even if Tellez had been mistaken in telling Moss he could not grieve improper medical care, if by this misinformation Tellez had prevented Moss from pursuing the grievance procedure, the court believes that equity would permit the court to find that the grievance procedure was not an "available remedy" and Moss was not required to pursue it further. The exhaustion requirement is not jurisdictional, *Perez*, 182 F.3d at 535. A plaintiff's claim that available administrative remedies would be ineffective does not excuse compliance, *id.* at 536-37, but it is something else if correctional employees tell the plaintiff that the grievance procedure is not a remedy. Perhaps Moss could have appealed Tellez's failure to pursue his grievance, but it would be unreasonable to expect Moss to know more about the institutional grievance procedure than Tellez, his counselor.

11

Moss states that he later filed another grievance just before he was transferred to Menard. He states that his grievances "became 'lost' in transit," he did not know that they were not being reviewed, and so did not refile them from Menard. Plf. Resp. at 7-8. Again, we believe that if Moss's failure to pursue the grievance procedure was not his fault, the exhaustion requirement will not bar his claim.[3] It may be that Moss is not telling the truth, but that is an issue of fact that may not be resolved on a motion to dismiss.[4] Accordingly, defendants' motion to dismiss Moss's medical care claims for failure to exhaust is denied.

## CONCLUSION

Defendants' motion to dismiss is granted as to defendants Wilson, Sarrazin, Hollenbeck and Reed, and denied as to defendants Nance, Mormon and Craig. These defendants are directed to answer the complaint within thirty days of this order.

ENTER:

WAYNE ANDERSEN, District Judge
UNITED STATES DISTRICT COURT

DATED: March 9, 2000

---

[3] The court was able to locate only one judicial opinion addressing a plaintiff's claim that he was actively prevented from following the grievance procedure. The court held that interference would excuse compliance, and ordered an evidentiary hearing held. *Johnson v. Garraghty*, 57 F.Supp.2d 321, 329 (E.D.Va. 1999).

[4] The court also notes that submission of an affidavit stating that no grievances have been found at the Administrative Review Board level, as defendants have done here, is inappropriate in connection with a motion to dismiss. Although the court can take judicial notice of matters of public record without converting a motion to dismiss into one for summary judgment, *Henson v. CSC Credit Services*, 29 F.3d 280, 284 (7th Cir. 1994), the court will not presume that grievance files are public records. In any event the court is being asked to accept as true an individual's statement that something is not found in the records, which is quite another matter.